IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

EVERGREEN SPORTS, LLC,                )
                                      )
            Plaintiff,                )
                                      )
v.                                    )        Civil Action No. 3:12CV911–HEH
                                      )
SC CHRISTMAS, INC., *et al.*,         )
                                      )
            Defendants.               )

MEMORANDUM OPINION
(Awarding Damages after Bench Trial)

This is a contract dispute involving the purchase of a warehouse in Pocahontas,

Arkansas, which is not at issue, and the majority of its contents. The inventory, which

consisted of almost three million items, included products with professional and college

sports team logos, such as programmable pens, Christmas wreaths, football and helmet

pens, super balls, nutcracker musicals, acrylic ornaments, desk sets, and an item referred

to as a flying monkey. The inventory, purchased in bulk and intended for resale, was

acquired by the Plaintiff under an Asset Purchase Agreement (the "Purchase

Agreement"). Plaintiff's core claim is that the products purchased were nonconforming,

in that they were damaged, defective, or otherwise unsalable in the normal course of

business. Other items were either not licensed for commercial sale or were subject to

licenses which had expired. Plaintiff's contract claim turns on Section 11(f)(i) of the

Purchase Agreement, which warrants that the inventory purchased from Defendants is

"free from defects in materials and workmanship." (Defs.' Mem. Support Mot. Summ. J., Ex. A at 6, ECF No. 35 (hereinafter "Purchase Agreement").)

After reviewing memoranda filed by each party with accompanying exhibits, and hearing oral argument on September 25, 2013, this Court granted Plaintiff's Motion for Summary Judgment as to liability. Finding the record inadequate to assess damages, this Court heard evidence on damages and Plaintiff's claim for indemnification on October 29, 2013. The bulk of Plaintiff's claim for indemnification consists of attorneys' fees and related litigation expenses. Each party was afforded an opportunity to submit additional memoranda addressing those issues.

Before awarding damages, it is important to provide some context for Plaintiff's entitlement to summary judgment on liability, particularly because Plaintiff seeks damages for the entire unsold inventory of items acquired from the Defendants. At both summary judgment and trial, the Defendants contend that Plaintiff is unable to identify what specific items of inventory, if any, were in a damaged condition prior to delivery. Furthermore, Defendants maintain that even if a portion of the inventory was damaged, Plaintiff's evidence fails to demonstrate that it was sufficient to warrant discontinuation of resale of the entire balance of remaining inventory. Plaintiff maintained at summary judgment and at trial that aside from a de minimis number of salable items, the vast majority of the inventory was defective or unlicensed for resale. Based on the number of items returned as defective, and to protect the goodwill of its business, Plaintiff elected to cease all sales of products acquired from the Defendants.

In awarding summary judgment on the issue of liability, this Court found that

Plaintiff had proffered evidence supporting its allegation that a significant but

unquantified portion of the inventory was damaged prior to delivery. This Court

articulated the following conclusion:

> Despite Defendants' contention to the contrary, Plaintiff proffers in
> its Motion for Summary Judgment virtually unrebutted evidence that
> Defendants were aware of the defective nature of the inventory prior to
> sale. Two prior managerial employees of Defendants who transitioned to
> Plaintiff after the warehouse in which they were employed was conveyed
> under the Purchase Agreement, confirm Plaintiff's claim. Derrick Difani
> ("Difani"), manager of the Pocahontas Warehouse under SC Christmas, and
> David Futrell ("Futrell"), the former assistant manager, have filed sworn
> declarations describing Defendants' inability to sell the inoperable,
> defective and damaged sports inventory prior to entering into the Purchase
> Agreement with Plaintiff.

(Mem. Op. 9–10, ECF No. 54.)

> [I]n July 2013, Futrell, assistant manager of the Pocahontas Warehouse,
> was tasked by Plaintiff with examining and testing the remaining inventory
> for defects and functionality. The majority were found by Futrell to be too
> defective for resale. (Pl.'s Mem. Support Mot. Summ. J. Ex. 4 at 4–10.)
> Futrell determined that helmet and football pens failed to light even with
> new batteries (*id.* at 4.); the Christmas wreaths were infested with bugs and
> had berries and garland missing (*id.* at 7); musical nutcrackers did not
> function (*id.* at 8); acrylic ornaments had corroded batteries (*id.* at 9); and
> the desk sets were damaged at the base and bore defective paint (*id.* at 10).
> Both Difani and Futrell concluded that due to its condition, the inventory
> purchased from Defendants could not be sold in the ordinary course of
> business.

(*Id.* at 10–11.)

Therefore, in awarding Plaintiff partial summary judgment as to liability, this

Court necessarily found that at least portions of the inventory were in a damaged,

nonconforming condition prior to delivery. The Court, however, reserved judgment on

what portion of the inventory was in fact "merchantable, usable and salable in the ordinary course of business" and was "free from defects in materials and workmanship" as warranted in Section 11(f)(i) of the Purchase Agreement. (Purchase Agreement at 6.)

The standard of measure for assessing damages in nonconforming goods cases is well settled. The defendant is entitled to the difference between the value of the goods as represented at the time of purchase, and the value of the inventory as delivered.[1] *See Neilson Bus. Equip. Ctr., Inc. v. Italo V. Monteleone, M.D.*, 524 A.2d 1172, 1176 (Del. 1987); *McLachlan v. Wilmington Dry Goods Co.*, 41 Del. 378, 384 (Del. Super. Ct. 1941). "Contract damages are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed." *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) (internal quotation marks omitted).

Although the total number of items purchased from Defendants was 2,826,938 at a cost of $5,060,926,[2] Plaintiff only seeks reimbursement for approximately 350,000 defective items. In part, the figure reflects the fact that some items purchased were resold.

---

[1] Under Section 19(f) of the Purchase Agreement, its enforcement, interpretation and construction is governed by the laws of the State of Delaware. (Purchase Agreement at 14–15.)

[2] John Toler, Chief Operating Officer of Evergreen Enterprises, Inc., estimated that the inventory had a wholesale value of approximately $12,000,000. (Hr'g Tr. 49, ECF No. 72.) He based this valuation on a couple of factors. First, he relied on his experience in the wholesale market for similar goods. (*Id.* at 141–42.) Second, he considered the prices for comparable items contained in Defendants' own catalog. (*Id.* at 85.)

John Toler ("Toler") Chief Operating Officer of Evergreen Enterprises, Inc.,[3]

testified at trial that the approximate wholesale value of the 350,000 remaining items was

about $1,600,000. (Hr'g Tr. 84–85.)  Toler, who has seventeen years of experience in

marketing sports logo goods, testified that distressed inventory typically sells at

approximately 50–70 percent of wholesale value.  Toler, who was involved in the

acquisition of the goods presently at issue, estimated that the remaining inventory had a

fair market value of 50 percent of its wholesale worth.  Accordingly, Toler testified that

Evergreen was seeking $827,585 for unsalable goods and $439,499 in associated costs,

fees and chargebacks.  The latter figure includes the cost of resolving the patent

infringement claim involving the flying monkey.  Toler conceded that the volume of

goods and the marketability of individual items in each category complicated the damage

calculation process.[4]

Toler also explained that the defective nature of the goods, in most cases, was not

readily detectable from the exterior of the packaging.  The scale of defects was not

apparent until items were removed from boxes at a trade show several months after the

deal closed.  Even after discovery, there was no reasonable means to segregate defective

products.  Detailed inspection required breaking the outer wrapping, rendering the item

unsalable.  Retailers would not accept taped up packages for resale.  (Hr'g Tr. 60–61.)

Toler was also aware of the defects revealed during the tests performed by Evergreen's

---

[3] Evergreen Enterprises, Inc. is the holding company for the constellation of Evergreen companies, including Plaintiff Evergreen Sports, LLC.  Toler explained that Evergreen Sports was specifically established for the acquisition of SC Christmas.

[4] Damages need not be proven with mathematical certainty as long as the court has a basis to make a reasonable estimate. *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 466 (Del. Ch. 2011). *See also Greenstar, LLC v. Heller*, 934 F. Supp. 2d 672, 694 (D. Del. 2013).

employees, Difani and Futrell. (*Id.* at 56.) Toler further opined that repair, such as replacement of batteries and removal of mold from wreaths, was neither practical nor economically feasible.[5] He stated that Evergreen did not have sufficient personnel to perform such repairs. Moreover, in his opinion, it would not be cost effective given the nature of their business and value of the goods. That is why, Toler indicated, Evergreen relied on the representations and warranties contained in Section 11(f)(i) of the Purchase Agreement. The need for such refurbishing was not contemplated in negotiating the deal, according to Toler. (*Id.* at 62.) "[I]t's not feasible for us to rework, touch, repair 350,000 pieces of inventory . . . given [the] low wholesale value of the product." (*Id.* at 67–68.) Furthermore, Toler explained that such remedial steps would "erode" the profit margin anticipated on the deal. (*Id.* at 70.)

Prior to discontinuing sales, Toler solicited the assistance of Defendants in repairing some of the items or locating a buyer. Defendants declined to do so and refused to adjust the purchase price, rescind the deal or accept return of the inventory. (*Id.* at 73, 76.) This litigation ensued.

Turning to the claim for indemnification,[6] Toler admitted on cross examination that Evergreen had not been formally named as a party in the patent infringement litigation involving an item known as a flying monkey. The lawsuit, filed in the U.S.

---

[5] Toler testified that even after replacing batteries in the programmable pens, they still would not function (Hr'g Tr. 112); the super balls would not bounce and were too opaque to clearly reveal the team logo (*Id.* at 63); the helmet and football pens needed batteries and ink (*Id.*); and The Olde World Wreaths had mold, bugs and pieces falling off (*Id.* at 64).

[6] Paragraph 17 of the Purchase Agreement required the seller to "defend, indemnify, save and keep harmless Purchaser and its officers, directors, . . . and permitted assigns against and from all Damages sustained or incurred . . . from or arising out of . . . any . . . breach of any representation and warranty made by Seller . . . ."

District Court for the Northern District of Illinois, named the National Football League ("NFL"), Major League Baseball ("MLB"), National Hockey League ("NHL") and other sports organizations. Evergreen acquired over 4,700 flying monkeys as part of the inventory purchased from the Defendants. Unbeknown to Evergreen, they were not properly licensed for commercial distribution. Evergreen, however, was able to sell the vast majority. Therefore, Evergreen does not seek reimbursement for the remaining 229, only the costs associated with settling the litigation. This included $60,000 in damages, plus attorneys' fees and expenses, totaling $88,249.50. The $60,000 in damages was paid by Evergreen Enterprises, Inc., the holding company, with intercorporate reimbursement by Evergreen Sports (*Id.* at 170). Evergreen was unaware of the patent problem at the time they purchased the goods. (*Id.* at 99.)

In settling the patent claim, Toler explained that Evergreen was advised by the NFL that it was their responsibility to resolve. Evergreen had an obligation, according to Toler, to cover their partners, the NFL, MLB and NHL, under their license agreement to sell products bearing the logo of teams affiliated with those organizations. Aside from a contractual responsibility, Toler added that Evergreen did not want to jeopardize a valuable business relationship. Therefore, Evergreen elected to settle the dispute and seek indemnification from Defendants, who contest both the amount of the settlement and the attorneys' fees. Toler indicated that the original demand from the patent holder was either $350,000 or $300,000—they settled for $60,000.

(*Id.* at 99–100.)

The second and last witness called by Plaintiff was Christopher Wornom ("Wornom"). Wornom serves as the Business Development and Acquisitions Manager at Evergreen Enterprises, Inc. He testified that he had previous experience with mergers and acquisitions. One of his responsibilities in his present capacity with Evergreen is the valuation and pricing of sports logo products. He prepared Plaintiff's Trial Exhibit 101, which details their damages and indemnification calculation. (*Id.* at 164.)

Wornom was directly involved in negotiating the purchase of the inventory from SC Christmas at issue in this case. As part of that process, he evaluated the inventory and assessed its retail value. Based on Evergreen's sale of similar products, he concurred with Toler that the remaining inventory on hand was probably worth 50 percent of its wholesale value. He also indicated that attempts to resolve disputes over defective items with Defendants proved to be unavailing.

Wornom confirmed that Evergreen received what he described to be a substantial number of claims of defects in all categories of products purchased from Defendants. Some of these items were returned by the purchaser to Evergreen with the vendor receiving either a refund or credit.[7] Although Wornom admitted on cross examination that he had no personal knowledge of the exact number of the remaining items in each

---

[7] The vendor who purchased the bulk of the desk sets, Closeouts with Class, demanded a chargeback on their account, but did not return the items to Evergreen's warehouse. (Hr'g Tr. 236.) This is the basis for Evergreen's claim of $30,418. (Pl.'s Tr. Ex. 101.) Exhibit 101 also reflects a chargeback of $2,051 by David Adams Card World for defective helmet pens, which were not returned to Evergreen. All returned inventory was restored to the Quantity On Hand column of Exhibit 101. (Hr'g Tr. 177.)

category that were defective, in his opinion, further marketing of those products would have been commercially risky.[8]  (*Id.* at 182, 186.)

Turning next to the unlicensed products, Wornom indicated that administering license agreements with sports organizations was part of his responsibility.  The items of this type for which Evergreen is seeking damages fall into three broad categories—items the Defendants were not licensed to sell, items bearing expired logos, and items for which Defendants' licenses had expired.  Some items, according to Wornom, had been created by SC Christmas without proper authority from league officials.  (*Id.* at 219.)

With respect to the items bearing expired sports team logos, Evergreen seeks damages of $55,657, representing 50 percent of the wholesale value of the 21,577 items on hand.[9]  As to the logo products that Defendants were never licensed to sell, of which 9,890 items were not sold, Evergreen claims damages of $17,468, again representing 50 percent of wholesale value.  In addition, Evergreen seeks to recover $140,925 for sports logo products for which Evergreen itself was never licensed to sell.  There were 50,467 items in this category.  Wornom stated that Evergreen was able to find a purchaser for a limited number of items with outdated logos.

Evergreen was also able to augment its existing licenses to include some logo products acquired from SC Christmas.  These were not included in Evergreen's

---

[8] Wornom acknowledged that Evergreen's records reflected that in less than five categories of product, 50 or more individual items had been returned by vendors.  However, Wornom hastened to add that the records do not reflect the number of nonconforming or defective items reimbursed but not returned to the warehouse.

[9] Wornom testified that under the standard licensing agreement, leagues reserved the right to order discontinuation of sales of certain items if teams abolished or revised their logos.  Typically, vendors are afforded a 60-day window to sell off inventory.  This grace period, however, did not apply in this case. (Hr'g Tr. 212–219.)

calculation of damages. The balance of inventory in this category, in Wornom's opinion, were unsalable. (*Id.* at 186.) SC Christmas disagrees maintaining that Evergreen either had or could have acquired the necessary license to sell these products. While SC Christmas pointed to documentary exhibits suggesting this possibility, it offered no evidence to support this contention.

Also among the unlicensed inventory were various NASCAR products of which Evergreen was aware at the time of purchase. Toler testified that Evergreen made no effort to obtain a license from NASCAR and had no desire to acquire one. (Hr'g Tr. 126, 130.) According to Plaintiff's Trial Exhibit 101, Evergreen acquired 38,237 NASCAR items with a 50 percent discounted wholesale value of $99,251. Since Evergreen took possession with knowledge that the NASCAR items could not be resold, no damages will be awarded for this category of product.[10]

Wornom was specifically asked on cross examination why Evergreen was unable to identify the various unlicensed items prior to accepting delivery from the Defendants. In response, Wornom explained that he would have been unable to recognize specific unauthorized items on casual inspection without unsealing packages. (*Id.* at 245.) He also concluded that in his opinion, the unlicensed sports logo items were not salable in the ordinary course of business at the time of delivery, as warranted in Section 11(f) of the Purchase Agreement.

---

[10] Although Plaintiff appears to imply that it is not seeking damages for the NASCAR logo products, 38,237 such items are included in their calculation of damages. (Pl.'s Trial Ex. 101.)

Aside from a number of documents, the Defendants offered no additional affirmative evidence to counter the testimony of Toler and Wornom.

In the final analysis, this Court is of the opinion that Plaintiff has demonstrated by a preponderance of the evidence that a significant portion of the inventory acquired from SC Christmas was defective or nonconforming at the time of delivery, in violation of the warranty provided in Section 11(f)(i) of the Purchase Agreement. The Court is similarly persuaded that the number of defects encountered by Plaintiff, coupled with complaints and returns by purchasers, made Plaintiff's decision to cease further sales of all products justified and commercially reasonable. Therefore, Plaintiff is entitled to recover damages for all unsold inventory in most categories of products claimed.

The Court further finds that the damages reflected on Plaintiff's Trial Exhibit 101, under "Value on Hand @ 50% Wholesale" ($827,585), is reasonable and supported by the evidence, with the exception of $99,251 for NASCAR logo products. In addition, the Court finds that Plaintiff is entitled to $32,469, representing credit for items either returned or for which payment was refused. This results in a subtotal of $760,803.

Turning next to Plaintiff's claim for indemnification, the Court finds by a preponderance of the evidence that it is appropriate in this case under Paragraph 17 of the Purchase Agreement. Categorically, Plaintiff's claim encompasses the cost of the immediate litigation, coupled with the expenses and payment necessary to resolve the flying monkey patent litigation. Initially, this Court finds that the $60,000 payment to

settle the flying monkey patent litigation was reasonable and necessary to fulfill

Plaintiff's contractual obligations to sports logo licensing authorities.[11]

The next element of damages sought by Plaintiff is indemnification under Section

17 of the Purchase Agreement. At trial, Plaintiff limited its evidence to legal fees and

expenses billed through September 30, 2013. This figure totaled $435,283.50, consisting

of $330,272.50 in attorneys' fees in connection with this litigation, $88,249.50 associated

with the patent litigation, and $16,761.50 in expenses. Approximately one month

following the trial on damages and indemnification, Plaintiff filed a "Motion to

Supplement the Record to Include Fees and Expenses Incurred Since the October 29,

2013 Hearing" (ECF No. 75). In this pleading, Plaintiff requested over $208,000 in

additional fees for preparation and representation at trial. Because Defendants object to

this filing as untimely, this claim will be dealt with separately.

The Complaint in this case was filed on December 31, 2012. The Defendants, SC

Christmas and Stan Aldridge, filed a motion to dismiss under Federal Rule of Civil

Procedure 12(b)(6) on February 25, 2013. Both parties filed supporting memoranda.

That motion was denied without oral argument. Subsequently, in April, the attorneys

participated in a brief pretrial conference at which a trial date was set and a discovery

schedule established. Cross motions for summary judgment were filed in August, and the

Court heard oral argument on September 25, 2013. In the interim, counsel participated in

settlement conferences with Magistrate Judge Novak. Judge Novak conferred with

---

[11] In addition, Plaintiff also seeks attorneys' fees in the amount of $88,249.50 in connection with the flying monkey patent infringement litigation.

counsel in person on August 12 and 13, and conducted brief follow up conference calls on August 19, 23, 29 and October 1. This process proved to be unavailing.

Following an award of summary judgment by this Court on the issue of liability, a bench trial was held on October 29 on the issues of damages and indemnification. This hearing required approximately six hours. In preparation for the bench trial on damages, each side submitted notebooks containing voluminous documents, a portion of which were admitted into evidence. Each side also tendered memoranda explaining their respective positions. As mentioned above, Plaintiff's claim for attorneys' fees and expenses relating to the October 29, 2013 trial will be considered in a separate memorandum opinion following supplemental briefing.

The Defendants counter that the attorneys' fees and expenses claimed by Plaintiff are excessive. They contend, in essence, that the litigation expenses Plaintiff claims are disproportionate to the complexity of the case and the reasonable time necessary to provide appropriate representation. The Defendants, however, fail to particularize the specific contested expenses or offer any evidence to discount Plaintiff's claimed amount.

Although Plaintiff's claim for attorneys' fees is pursued under a contractual indemnification theory, the same analysis informs the Court's decision as any other award of attorneys' fees. Typically, courts begin the computational process by calculating a lodestar figure. *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009). This methodology entails the multiplication of hours reasonably expended times a reasonable rate, the product of which yields a presumably reasonable fee. *Pa. v. Del. Valley Citizens Council for Clean Air*, 478 U.S. 546, 564 (1986). In

13

determining a reasonable amount to award in attorneys' fees, it is well within the discretion of the district court to adjust the lodestar figure upward or downward as it deems appropriate. However, "this must be done on a principled basis, clearly explained by the court." *Lyle v. Food Lion, Inc.*, 954 F.2d 984, 989 (4th Cir. 1992).

In assessing the reasonableness of the lodestar figure, the Fourth Circuit in *Robinson* suggests consideration of the following factors:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the out-set of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Robinson*, 560 F.3d 235 at 243–44 (citing *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717–19 (5th Cir. 1974)).[12]

Collectively, the attorneys representing the Plaintiff seek compensation through September 30, 2013 for approximately 692 hours of legal services rendered by five attorneys. They also ask for reimbursement of 28.7 hours of time utilized by paralegals. This includes 19.4 hours of paraprofessional time, at $260 an hour, and 9.3 hours at $175, for a total of $6,671.50. While this figure for paralegal services appears to be on the high side, it seems to be supported by a review of the timesheets. The Court will therefore

---

[12] Delaware courts have adopted a similar computational methodology governed by analogous factual considerations. *See Mahani v. EDIX Media Group, Inc.*, 935 A.2d 242, 245–46 (Del. 2007).

find it to be reasonable and will award paraprofessional fees in the amount of $6,671.50 for services through September 30, 2013.

Focusing on services rendered by attorneys, Plaintiff seeks compensation for approximately 692 hours through September 30, 2013. This results in a total of approximately $330,272 claimed as attorneys' fees at this point. It also appears that Plaintiff is requesting $88,249.50 in legal fees for representation in connection with the Illinois flying monkey patent litigation.

Although this Court is aware that much of a trial attorney's time is devoted to investigation, research, analysis and trial preparation, the amount of time expended by counsel in this case appears to be more than typically necessary for a case of limited complexity. Counsel for the Plaintiff filed memoranda opposing Defendants' motion to dismiss and later seeking summary judgment. Plaintiff prevailed on the motion to dismiss and was partially successful on its cross motion for summary judgment. Neither motion, however, involved atypically complex legal issues or factual analysis. The governing law was well established and largely undisputed. Although the inventory at issue encompassed a large number of individual items, for expediency they were divided into approximately one dozen broad categories.

Counsel participated in a two day settlement conference conducted by a U.S. Magistrate Judge, with four follow up telephone calls. The bench trial, limited in scope to damages and indemnification, required only about six hours and two witnesses. Trial exhibits did include several hundred documents, but only a portion were actually placed into evidence or referred to at trial. This is not to imply, however, that Plaintiff's case

was not capably prosecuted. To the contrary, Mr. Ferak and Mr. Barger served their client well and prevailed on most issues. After carefully reviewing the timesheets filed by all five of the attorneys representing Evergreen, and weighing it against the case history, this Court is of the opinion that the number of reasonable hours for which fees should be awarded is 600, exclusive of the flying monkey patent litigation. Because of the billing format employed, it is difficult to determine the precise tasks performed. But collectively viewed, the time expended is difficult to square with the complexity of the case.

After determining a reasonable number of hours to perform the necessary legal services, the Court must next identify a reasonable rate of compensation. Although the Defendants contend that the hourly rates charged by Plaintiff's counsel are excessive, they neither offer alternative rates nor evidence challenging specific services rendered. In this Court's opinion, the hourly rates suggested by Plaintiff's counsel are reasonable and consistent with prevailing rates in the Richmond, Virginia area. The hourly rates claimed also adequately reflect the "novelty and difficulty of the questions raised," "the skill required to properly perform the legal services rendered" in this case, the "customary fee for like work," "awards in similar cases," "the amount in controversy and the results obtained" and "the experience, reputation and ability of the attorney." *See Robinson*, 560 F.3d at 243.

Given the record at hand and the billing format, the number of hours apportionable to each attorney, within the 600 hours allowed, cannot be determined with mathematical

precision. Relying on the time records submitted by Plaintiff,[13] the Court will therefore calculate the fee award based on the percentage of total hours initially billed by each attorney. The results of this calculation are as follows:

| | |
|---|---|
| Ferak:  56% of 600 hours = 336 hours at $550 per hour = $184,800 | |
| Barger:  10% of 600 hours = 60 hours at $690 per hour = $ 41,400 | |
| Jones:  29% of 600 hours = 174 hours at $275 per hour = $ 47,850 | |
| Striker:  5% of 600 hours = 30 hours at $650 per hour = $ 19,500 | |
| Total: | $293,550 |

With respect to the attorneys, the fee awarded for services rendered in the immediate lawsuit, through September 30, 2013, is therefore $293,550, based on 600 allowable billable hours. In addition, the Court will award Plaintiff $88,249.50 for representation in connection with the flying monkey patent litigation.[14] This results in attorneys' fees of $381,799.50, plus $6,671.50 for paraprofessional services, equaling a total award of $388,471.

In calculating the appropriate award of attorneys' fees in this case, the Court has considered all the factors articulated by the Fourth Circuit in *Robinson*, which are applicable in this case. Because these fees are being awarded under an indemnification, or fee shifting provision, the Court has also weighed the factors articulated by the Supreme Court of Delaware in *Mahani*.

---

[13] The time records consist of Plaintiff's Trial Exs. 42–50.
[14] The parties have directed the Court's attention to minimal information concerning this figure, which may include expenses.

The Plaintiff also seeks approximately $16,750 in expenses.  This sum includes third party copying fees, postage and courier fees, airfare and travel fees, research charges, and transcript and trial related expenses.  Most of Plaintiff's attorneys are based in their Chicago, Illinois office.  After reviewing the exhibits filed by Plaintiff in support of these fees, the Court is of the opinion that an award of $15,000 is reasonable and appropriate in this case.  This figure is based on the complexity of the litigation, the documents and pleadings submitted to the Court, and expenses awarded in similar cases.

Therefore, based on the foregoing, the Court will award Plaintiff damages in the amount of $760,803, attorneys' fees of $388,471, and litigation expenses totaling $15,000, plus interest from December 31, 2012, the date the suit was filed.[15]

Plaintiff has also filed a post-trial motion seeking fees and costs for the period of October 1, 2013 through November 30, 2013.  The Defendants have objected to these additional fees and expenses because they were neither disclosed nor proven as an element of damages during trial.  Defendants' argument is premised on the fact that attorneys' fees and expenses are being awarded as damages under a contractual indemnification provision, not by the Court pursuant to statute or as a post-trial sanction.  The Court will address Plaintiff's entitlement to additional fees and expenses after both sides have been afforded an opportunity to brief the issue.

---

[15] The Defendants argue that invoices for legal services in this case were directed to Evergreen Enterprises, Inc. and not the Plaintiff entity Evergreen Sports, LLC.  The evidence at trial clearly established that Evergreen Enterprises, Inc. is a holding company for all Evergreen entities, which include Evergreen Sports, LLC.

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
United States District Judge

Date: December 20, 2013
Richmond, VA